**15-1778-cv**
***Urbont v. Sony Music Entertainment***

1                     UNITED STATES COURT OF APPEALS
2                       FOR THE SECOND CIRCUIT
3
4                            August Term, 2015
5
6     (Submitted:  March 24, 2016            Decided: July 29, 2016)
7
8                          Docket No. 15-1778-cv
9     _____
10                             _____
11
12                            JACK URBONT,
13
14                        *Plaintiff-Appellant*,
15
16                              - v.-
17
18    SONY MUSIC ENTERTAINMENT, INDIVIDUALLY, D/B/A EPIC RECORDS, RAZOR SHARP
19                           RECORDS, LLC,
20
21                       *Defendants-Appellees,*
22
23               DENNIS COLES, A/K/A GHOSTFACE KILLAH,
24
25                         *Defendant.*[*]
26
27    _____
28
29    Before:
30    JACOBS, HALL, and LYNCH, *Circuit Judges*.
31
32         Appeal  from  the  judgment  of  the  United  States  District
33    Court  for  the  Southern  District  of  New  York  (Buchwald, *J.*)
34    granting Defendants-Appellees' motions for summary judgment on
35    plaintiff's  federal  copyright  claim  and  his  related  state  law
36    claims.   We hold that the district court erred in determining
37    that plaintiff failed to raise genuine issues of material fact
38    with  respect  to  his  federal  copyright  infringement  claim  but
39    that  the  court  properly  granted  summary  judgment  to  the
40    appellees  on  plaintiff's  state  law  claims.   The  judgment  is
41    therefore AFFIRMED in part and VACATED and REMANDED in part.

          _____

[*] The Clerk of Court is respectfully directed to amend the
caption to conform to the above.

1

Richard S. Busch, King & Ballow,
Nashville, TN, and Elliot Schnapp,
Gordon, Gordon & Schnapp PLLC, New
York, NY, *for* Plaintiff-Appellant.

Marc S. Reiner, Hand Baldachin &
Amburgey LLP, New York, NY, *for*
Defendants-Appellees.

HALL, *Circuit Judge*:

In this copyright case, Plaintiff-Appellant Jack Urbont brought suit to enforce his claimed ownership rights in the "Iron Man" theme song against what he alleges is infringement by Defendants Sony Music Entertainment ("Sony"), Razor Sharp Records, and Dennis Coles, a/k/a Ghostface Killah.[1] In the proceedings below, Defendants-Appellees Sony and Razor Sharp Records challenged Urbont's ownership of the copyright by arguing that the Iron Man theme song was a "work for hire" created at the instance and expense of Marvel Comics ("Marvel"). The district court agreed, and it determined that Urbont failed to present sufficient evidence to rebut the presumption that Marvel was, in fact, the copyright owner. The court dismissed Urbont's New York common law claims for copyright infringement,

---

[1] Coles failed to participate in discovery during the proceedings below, and as a result the district court entered judgment against and imposed sanctions on him. (*See* Memorandum and Order, ECF No. 53.) Coles did not participate in the summary judgment motion and he is not a party to this appeal.

1  unfair competition, and misappropriation on the basis that those

2  claims were preempted by the Copyright Act.

3      We hold that although the district court properly

4  determined that the appellees had standing to raise a "work for

5  hire" defense to the plaintiff's copyright infringement claim,

6  the court erred in concluding that Urbont failed to raise issues

7  of material fact with respect to his ownership of the copyright.

8  We further conclude that the district court properly dismissed

9  Urbont's state law claims as preempted by the Copyright Act. We

10 thus vacate the district court's summary judgment ruling with

11 respect to plaintiff's Copyright Act claim and remand for

12 further proceedings consistent with this opinion. We affirm the

13 district court's ruling dismissing Urbont's state law claims.

14               I. Facts and Procedural History

15     Urbont is a composer and music producer who has written

16 theme songs for many well-known television shows.  In 1966,

17 Urbont wrote theme songs for various characters in the Marvel

18 Super Heroes television show ("Marvel series" or "series")—

19 including Captain America, Hulk, Thor, Sub-Mariner, and the

20 "Iron Man" theme song at issue in this case.  He also composed

21 opening and closing songs for the series.  According to Urbont,

22 he offered to write the music for the series after being put in

23 touch with Marvel producer Stan Lee by a mutual friend.  Prior

24 to this introduction, Urbont was unfamiliar with the Marvel

characters, and he had not previously written music that could be used for the series. Lee agreed to hear Urbont's submissions. He provided Urbont with comic books to use as source material and information about the characters. After Urbont "looked over the material [and] absorbed the nature of the character," A. 118, he composed the Iron Man superhero theme and presented it to Lee, who accepted the work as written. It is undisputed that the sound recording of the Iron Man theme song was never released as an independent audio recording without a visual component.

In his deposition testimony, Urbont claims that his offer to compose the theme music for the Marvel series was contingent on his retaining ownership rights in the work. He explained as follows:

> I was not hired when I wrote the songs. I wrote the songs on spec[ulation] hoping that [Marvel] would use them. But the ownership of the material, as it always has been when I create material that I'm not being hired directly for as opposed to let's say my writing a pilot for MGM or Paramount, and my relationship is spelled out prior to my writing a single note. When it is not that type of situation, I own the material and I'm thrilled to be able to get it into the project, but I own it. It's a firm condition of the way I've operated. And [Marvel] was aware of it.
>
> A. 93-94.

4

1      Further, Urbont claims that although Marvel was free to

2  accept or reject Urbont's compositions, it did not have the

3  right to modify them without Urbont's permission. Urbont

4  composed, recorded, and produced the music for the series

5  himself; although he needed money to cover his costs, he claims

6  he was not "trying to get rich on the project," A. 86, but

7  simply wanted to get credit and exposure. Urbont asserts that

8  Marvel did not pay him, even for costs, until after it accepted

9  the work. He ultimately received a fixed sum of $3,000 for all

10  the songs written for the series. Urbont did not have a written

11  royalty agreement with Marvel, but he states that he later

12  received royalties from BMI.

13      Urbont admits there was no written agreement with Marvel

14  establishing that he owned the rights to the Iron Man theme

15  song. He claims, however, that there was the oral agreement to

16  that effect, described above. In 1966, a music publisher was

17  issued a certificate of copyright registration by the U.S.

18  Copyright Office naming Urbont as the owner of the work, and

19  Urbont filed a renewal notice for the copyright in 1994. Since

20  renewing the copyright, Urbont has licensed the Iron Man

21  Composition for use in the 2008 Iron Man movie starring Robert

22  Downey Jr., and he has licensed his Marvel series theme songs on

23  other occasions. Additionally, in 1995 Urbont entered into a

24  settlement agreement ("the Settlement") with New World

5

Entertainment, Ltd. and Marvel Entertainment Group, Inc. (collectively, "Marvel") after bringing suit against Marvel for unauthorized use of the Iron Man composition and four other Marvel series compositions. As part of the Settlement, Urbont agreed to release his claims and to license the works to Marvel. The Settlement refers to Urbont as "renewal copyright owner of the . . . Superhero Intros . . . and the Master Recordings thereof" and refers to Marvel as "Licensee," but it expressly denies that Marvel faces "any liability to Owner." A. 78.

The appellees counter that Marvel did not share Urbont's understanding that he was the owner of the work. They note that in 1967, Marvel released a recording of two songs from the Marvel series with a copyright notice "Copyright © 1967 Marvel Comics Group." S.P.A. 88-89. Although the Iron Man song was not released on that record, the parties agree that all of the Marvel series songs were subject to the same ownership agreement. In addition, the appellees note that when Marvel sought copyright registrations for the Iron Man segments of its television program series, it did not reference any preexisting copyrighted works that were incorporated into the program.

In 2000, defendants Dennis Coles, the hip hop artist popularly known as Ghostface Killah, Sony, and Razor Sharp Records produced and released an album named Supreme Clientele that featured the Iron Man theme song on two tracks. It is

6

1   undisputed that the defendants did not seek permission from

2   Urbont to use those songs.  Urbont became aware of the album

3   sometime in late 2009 or early 2010.  He contacted Sony in 2010,

4   alleging that his copyright had been infringed.  Soon after, the

5   parties entered into an agreement to toll the statute of

6   limitations.

7        Urbont filed a complaint on June 30, 2011, and an amended

8   complaint on August 29, 2011.  The Amended Complaint asserts a

9   claim of copyright infringement under the Copyright Act, 17

10  U.S.C. § 101, *et seq.*,[2] and claims under New York common law for

11  copyright infringement, unfair competition, and

12  misappropriation.  Urbont's federal claim pertains to the Iron

13  Man composition, while his New York law claims are based on the

14  argument that the Iron Man theme song is, having been recorded

15  prior to 1972, a sound recording and therefore would be

16  protected under state law rather than under the Copyright Act.

17  *See* 17 U.S.C. § 301 (providing exception to Copyright Act's

18  preemption scheme for "sound recordings fixed before February

19  15, 1972"); *see also  Capitol Records, Inc. v. Naxos of Am.,

20  Inc.*, 4 N.Y.3d 540, 562-63 (2005) (explaining that New York

---

[2] Because the work at issue in this case was produced in 1966,
the Copyright Act of 1909, Pub.L. No. 60-349, 35 Stat. 1075,
governs Urbont's copyright infringement claim.  *See Baldwin v.
EMI Feist Catalog, Inc.*, 805 F.3d 18, 20 (2d Cir. 2015).

1   common law provides copyright protection to sound recordings not

2   otherwise protected by the federal Copyright Act).

3       Urbont moved for partial summary judgment. Appellees Sony

4   and Razor Sharp Records cross-moved for summary judgment. In a

5   Memorandum and Order, the district court denied Urbont's motion

6   and granted the appellees' motion. *See Urbont v. Sony Music*

7   *Entm't*, 100 F. Supp. 3d 342 (S.D.N.Y. 2015). The district court

8   first concluded that the appellees had standing to challenge

9   Urbont's ownership of the copyright under the "work for hire"

10   doctrine. *Id*. at 348–50. Next, it determined that the Iron Man

11   song was a "work for hire" because it was composed at Marvel's

12   "instance and expense," *id*. at 350-52, and that Urbont had not

13   presented evidence of an ownership agreement with Marvel

14   sufficient to overcome the presumption that the work was for

15   hire. The court rejected Urbont's contention that the 1995

16   Settlement was probative of the parties' intent at the time the

17   composition was written. *Id*. at 353–54. Finally, it dismissed

18   Urbont's state law claims on the ground that the Iron Man

19   recording is not a "sound recording" but rather part of an

20   "audiovisual work" subject to preemption under the Copyright Act

21   of 1976. *Id*. at 355-56. The district court later denied

22   Urbont's motion to reconsider its prior ruling. *Urbont v. Sony*

23   *Music Entm't*, No. 11 CIV. 4516 NRB, 2015 WL 3439244 (S.D.N.Y.

24   May 27, 2015). Urbont appeals the district court's ruling.

1          II. Discussion

2      Urbont contends that the district court erred in

3  determining that the appellees, as third parties to any

4  ownership agreement between himself and Marvel, had standing to

5  challenge his ownership rights under the "work for hire"

6  doctrine.  He further argues that the district court overlooked

7  genuine issues of material fact that he raised as to his state

8  and federal copyright claims.  We affirm the district court's

9  decision with respect to the appellees' standing and its

10 dismissal of Urbont's state law claims.  We reverse the court's

11 grant of summary judgment in favor of appellees on Urbont's

12 Copyright Act claim.

13          A. Standing

14     For purposes of the work for hire doctrine under the 1909

15 Copyright Act, "an 'employer' who hires another to create a

16 copyrightable work is the 'author' of the work for purposes of

17 the statute, absent an agreement to the contrary." *Playboy*

18 *Enters., Inc. v. Dumas*, 53 F.3d 549, 554 (2d Cir. 1995) (citing

19 17 U.S.C. § 26 (1976) (repealed)).

20     This Court has not explicitly decided whether a third party

21 to an alleged employer-employee relationship has standing to

22 raise a "work for hire" defense to copyright infringement.  *See*

23 *Psihoyos v. Pearson Educ., Inc.*, 855 F. Supp. 2d 103, 117 n.7

24 (S.D.N.Y. 2012) ("Courts have not dealt with this issue

9

extensively, but the few decisions to address the issue at all have generally found that a defendant does have standing to challenge ownership on this basis."). We have, however, implicitly permitted the use of the "work for hire" doctrine defensively by third-party infringers to refute a plaintiff's alleged ownership of a copyright. *See Aldon Accessories Ltd. v. Spiegel, Inc.*, 738 F.2d 548, 551-53 (2d Cir. 1984), *abrogated on other grounds by Cmty. for Creative Non-Violence v. Reid*, 490 U.S. 730 (1989)[3]; *see also Easter Seal Soc. for Crippled Children & Adults of La., Inc. v. Playboy Enters.*, 815 F.2d 323, 333 (5th Cir. 1987) (explaining that "[t]he 'work for hire' issue in *Aldon Accessories* arose as a defensive tactic adopted by a third-party infringer to dispute the validity of the plaintiff's copyright"). The Eleventh Circuit has explicitly held that a third-party infringer "does have the right to assert a [work-for-hire] defense." *M.G.B. Homes, Inc. v. Ameron Homes, Inc.*, 903 F.2d 1486, 1490 (11th Cir. 1990).

The Ninth Circuit, on the other hand, has rejected third-party standing under the "work for hire" doctrine, at least where both potential owners of the copyright are parties to the lawsuit and the issue of ownership is undisputed as between

---

[3] In our *Aldon Accessories* decision, the parties had not specifically challenged the alleged third-party infringer's standing to invoke the "work for hire" doctrine, and the Court did not rule on that issue.

them. *Jules Jordan Video, Inc. v. 144942 Canada Inc.*, 617 F.3d 1146, 1157 (9th Cir. 2010). In *Jules*, the panel reasoned, *inter alia*, that the purpose of the "work for hire" doctrine is "to establish ownership of a work as between a commissioning party or employer on the one hand and the commissioned party or employee on the other." 617 F.3d at 1157. Thus, "[i]t would be unusual and unwarranted to permit third parties . . . to invoke [the 'work for hire' doctrine] to avoid a suit for infringement when there is no dispute between the two potential owners, and both are plaintiffs to the lawsuit." *Id*. The panel noted that third-party infringers are not permitted to avoid suit for copyright infringement by invoking 17 U.S.C. § 204(a), a statute of frauds provision requiring contemporaneous memorialization of a copyright transfer, and it considered the reasoning behind that doctrine to be equally applicable in the "work for hire" context. *Id*. (citing *Imperial Residential Design, Inc. v. Palms Dev. Grp., Inc.*, 70 F.3d 96, 99 (11th Cir. 1995)).

Urbont asserts that the appellees lack third-party standing because there is no evidence that Marvel, which is not a party to this lawsuit, has ever challenged his claim to ownership of the copyright. By failing to challenge Urbont's registration of the copyright and licensing of the composition, he contends, Marvel has acquiesced in his commercial use of the composition. Therefore, just as third parties are not permitted to challenge

11

the validity of an otherwise-undisputed copyright transfer under Section 204(a), Urbont argues that the appellees should not be permitted to challenge the validity of his copyright on the basis that the Iron Man theme song was a "work for hire" when Marvel itself has not done so. *Cf. Eden Toys, Inc. v. Florelee Undergarment Co.*, 697 F.2d 27, 36 (2d Cir. 1982) (holding with respect to § 204(a) that where "the copyright holder appears to have no dispute with its licensee . . . it would be anomalous to permit a third party infringer to invoke this provision against the licensee"), *superseded by rule on other grounds as stated in Keeling v. Hars*, 697 F.2d 27 (2d Cir. 2015); *accord Barefoot Architect, Inc. v. Bunge*, 632 F.3d 822, 830 (3d Cir. 2011) ("At least where there is no dispute between transferor and transferee regarding the ownership of a copyright, there is little reason to demand that a validating written instrument be drafted and signed contemporaneously with the transferring event.").

We are unpersuaded by this argument. As an initial matter, the facts of the Ninth Circuit's decision in *Jules* are significantly distinguishable, as both potential owners of the copyright were plaintiffs to the lawsuit and there was no dispute between them with respect to ownership rights.[4] *See*

---

[4] Indeed, the individual plaintiff in that case was the sole shareholder, director, and officer of the entity plaintiff, and

1  *Jules*, 617 F.3d at 1157.   Here, by contrast, Marvel is not a

2  party to the lawsuit and has not had the opportunity to clarify

3  its position with respect to ownership of the copyright.[5]   Thus,

4  unlike in *Jules*, it is thus uncertain whether Marvel would

5  dispute Urbont's copyright ownership.   Even assuming that

6  Urbont's characterization of Marvel's position is correct,

7  moreover, we agree with the district court that the cases

8  interpreting Section 204 do not support the outcome he seeks—

9  preclusion of the appellees' standing to challenge the validity

10 of his copyright.   Section 204(a), a statute of frauds provision

11 for copyright transfers, was designed to "protect copyright

12 holders from persons mistakenly or fraudulently claiming oral

13 licenses."   *Eden Toys*, 697 F.2d at 36; *see also Lyrick Studios,*

---

exercised complete control over the entity.   *Jules*, 617 F.3d at
1156.

[5] The question of whether Marvel was required to be joined as a
party under Fed. R. Civ. P. 19 does not appear to have been
raised at any time during the litigation below.   Joinder may be
required, however, in cases where the determination of copyright
ownership has the potential to prejudice an individual that is
not a party to the suit and the requirements of Fed. R. Civ. P.
19 are met.   *See, e.g.*, *Marvel Characters, Inc. v. Kirby*, 726
F.3d 119, 132–35 (2d Cir. 2013) (noting that joinder of
"required" parties is compulsory under Fed. R. Civ. P. 19, but
permitting action to proceed on basis that parties not feasible
to joinder were not "indispensable"); *Eden Toys, Inc.*, 697 F.2d
at 36-37 (holding that it would be appropriate for district
court to join an employer in a lawsuit where it was possible
that the employer owned some of the rights infringed by the
defendant); 9 Causes of Action 2d 65 (1997) ("If the court deems
it appropriate, it may require the joinder of any person having
or claiming an interest in the copyright.").

1    *Inc. v. Big Idea Prods., Inc.*, 420 F.3d 388, 394 (5th Cir.

2    2005)("[C]ourts are hesitant to allow an outside infringer to

3    challenge the timing or technicalities of the copyright

4    transfer."). Section 204 thus furthers the ordinary purpose of

5    the statute of frauds: "[j]ust as requiring a written contract

6    prevents enforcement of a nonexistent obligation through the

7    exclusion of fraudulent, perjured, or misremembered evidence,

8    requiring a writing for enforcement of a copyright assignment

9    enhances predictability and certainty of ownership by preventing

10   litigants from enforcing fictitious agreements through perjury

11   or the testimony of someone with a faulty memory." *Barefoot*

12   *Architect*, 632 F.3d at 828–29 (internal quotation marks

13   omitted).

14        Unlike Section 204, which concerns the memorialization of

15   an ownership transfer, the "work for hire" doctrine guides the

16   determination of ownership rights as between employers and

17   employees or independent contractors. *See Marvel Characters,*

18   *Inc. v. Kirby,* 726 F.3d 119, 137–40 (2d Cir. 2013). A plaintiff

19   in a copyright infringement suit bears the burden of proving

20   ownership of the copyright, however, whether such ownership is

21   challenged by an ostensible employer or by a third party.[6] *See*

_____

[6] Indeed, plaintiffs must prove ownership not only as an element
of a copyright infringement claim, but also to assert their
standing to bring suit. *See Eden Toys*, 697 F.2d at 32 (noting
that only "(1) owners of copyrights, and (2) persons who have

14

1  *Island Software & Computer Serv., Inc. v. Microsoft Corp.*, 413

2  F.3d 257, 260 (2d Cir. 2005) (noting that a "claim of copyright

3  infringement under federal law requires proof that . . . the

4  plaintiff had a valid copyright in the work allegedly infringed"

5  (internal quotation marks omitted)).   Indeed, even courts that

6  have precluded third parties from challenging a plaintiff's

7  ownership rights under the statute of frauds provision in

8  Section 204 have permitted those parties to challenge the

9  validity of the underlying ownership transfer.   *See, e.g.,*

10 *Barefoot Architect*, 632 F.3d at 831 (holding that although

11 third-party defendant lacked standing to challenge plaintiff's

12 ownership by assignment under Section 204, plaintiff "failed to

13 raise a triable issue of fact as to whether the alleged . . .

14 oral transfer ever occurred"); *Eden Toys*, 697 F.2d at 36

15 (precluding challenge to validity of assignment under statute of

16 frauds, but remanding for district court to determine whether

17 underlying transfer occurred).   We thus conclude that third

18 parties to an alleged employer-employee relationship have

---

been granted exclusive licenses by owners of copyrights" have
standing to sue for copyright infringement (citing 17 U.S.C.
§ 501(b)); *see also ABKCO Music, Inc. v. Harrisongs Music, Ltd.*,
944 F.2d 971, 980 (2d Cir. 1991) (noting that third parties
are not permitted to sue on a copyright holder's behalf).   Urbont's
reasoning could, therefore, lead to the anomalous result of
permitting copyright infringement plaintiffs to proceed even
where they may lack standing to sue simply because an employer
has not challenged the validity of their copyright.

1   standing to raise a "work for hire" defense against a claim of

2   copyright infringement.

3                        B. Copyright Act Claim

4      The district court granted summary judgment in favor of

5   appellees on Urbont's federal copyright infringement claim,

6   holding that the Iron Man composition was a "work for hire" and

7   that Urbont failed to raise triable issues of fact regarding an

8   alleged ownership agreement with Marvel.  We review a district

9   court's grant of summary judgment *de novo*, applying the same

10  standards as the district court. *Kirby*, 726 F.3d at 135.

11  Summary judgment is appropriate "only if 'there is no genuine

12  dispute as to any material fact and the movant is entitled to

13  judgment as a matter of law.'" *Id.* (quoting Fed. R. Civ. P.

14  56(a)).  "When deciding a summary judgment motion, a . . .

15  court's function is not to weigh the evidence, make credibility

16  determinations or resolve issues of fact, but rather to

17  determine whether, drawing all reasonable inferences from the

18  evidence presented in favor of the non-moving party, a fair-

19  minded jury could find in the non-moving party's favor." *Beatie*

20  *v. City of New York*, 123 F.3d 707, 710-11 (2d Cir. 1997)

21  (internal citation omitted).

22     To prove a claim of copyright infringement, a plaintiff

23  must show (1) ownership of a valid copyright and (2) copying of

24  constituent elements of the work that are original. *Boisson v.*

1  *Banian, Ltd.*, 273 F.3d 262, 267 (2d Cir. 2001).  Urbont asserts

2  that he is the owner of a valid copyright to the Iron Man theme

3  song because he has produced a copyright registration from 1966

4  that lists him as "author," A. 64, and a renewal registration

5  from 1995 that lists him as owner.  Production of a certificate

6  of registration made before or within five years after first

7  publication of the work constitutes prima facie evidence of the

8  validity of the copyright.  17 U.S.C. § 410(c); *see also Hamil*

9  *Am., Inc. v. GFI*, 193 F.3d 92, 98 (2d Cir. 1999).  However, "a

10 certificate of registration creates no irrebuttable presumption

11 of copyright validity," and "where other evidence in the record

12 casts doubt on the question, validity will not be assumed."

13 *Estate of Burne Hogarth v. Edgar Rice Burroughs*, *Inc.*, 342 F.3d

14 149, 166 (2d Cir. 2003) (internal quotation marks and citation

15 omitted).  Although the plaintiff bears the burden of proving

16 copyright ownership, "[t]he party challenging the validity of

17 the copyright [registration] has the burden to prove the

18 contrary." *Hamil Am., Inc.*, 193 F.3d at 98.

19             1. The "Work for Hire" Doctrine

20     The 1909 Copyright Act mentions works for hire only in the

21 definition section of the statute, where it states that "[i]n

22 the interpretation and construction of this title . . . the word

23 'author' shall include an employer in the case of works made for

17

hire."[7]  17  U.S.C.  §  26  (1976)  (repealed).  "Under  this definition,  an  'employer'  who  hires  another  to  create  a copyrightable  work  is  the  'author'  of  the  work  for  purposes  of the  statute,  absent  an  agreement  to  the  contrary."  *Playboy Enters., Inc.*,  53  F.3d  at  554.  Because  the  statute  does  not define  "employer"  or  "author,"  courts  apply  what  is  known  as  the "instance  and  expense  test."  *Kirby*,  726  F.3d  at  137.  As  a general  rule,  "[a]  work  is  made  at  the  hiring  party's  'instance and  expense'  when  the  employer  induces  the  creation  of  the  work and  has  the  right  to  direct  and  supervise  the  manner  in  which the  work  is  carried  out."  *Id.*  at  139  (quoting  *Martha Graham*,  380  F.3d  at  635);  *see also Siegel v. Nat'l Periodical Publs., Inc.*,  508  F.2d  909,  914  (2d  Cir.  1974)  (explaining  that  work  is made  for  hire  when  the  "motivating  factor  in  producing  the  work was  the  employer  who  induced  the  creation"  (internal  quotation marks  omitted)).

"'Instance'  refers  to  the  extent  to  which  the  hiring  party provided  the  impetus  for,  participated  in,  or  had  the  power  to supervise  the  creation  of  the  work."  *Kirby*,  726  F.3d  at  139.

---

[7] "The  concept  of  'work  made  for  hire'  remains  in  the  1976  Act, which  defines  the  phrase  to  mean  'a  work  prepared  by  an  employee within  the  scope  of  his  or  her  employment'  or,  for  certain  types of  works,  'a  work  specially  ordered  or  commissioned.'"  *Martha Graham Sch. & Dance Found., Inc. v. Martha Graham Ctr. of Contemporary Dance, Inc.*,  380  F.3d  624,  635  (2d  Cir.  2004) (quoting  17  U.S.C.  §  101)).

"Actual creative contributions or direction," such as providing specific instructions to direct the work's completion, "strongly suggest that the work is made at the hiring party's instance." *Id.*; *see Playboy Enters., Inc.*, 53 F.3d at 556 (holding that work was for hire based on Playboy's specific instructions to independent contractor); *Yardley v. Houghton Mifflin Co.*, 108 F.2d 28, 30-31 (2d Cir. 1939) (explaining that customers who solicited and paid for photographer's services owned copyright to the photographs taken). The right to direct and supervise the manner in which the work is carried out, moreover, may be enough to satisfy the "instance" requirement even if that right is never exercised. *Martha Graham*, 380 F.3d at 635.

"The 'expense' component refers to the resources the hiring party invests in the creation of the work," in order to "properly reward[] with ownership the party that bears the risk with respect to the work's success." *Kirby*, 726 F.3d at 139-40. One factor in this inquiry is the method of payment. We have held that a hiring party's payment of a sum certain in exchange for an independent contractor's work satisfies the "expense" requirement, while payment of royalties generally weighs against finding a "work for hire" relationship. *Playboy Enters., Inc.*, 53 F.3d at 555. In addition, we have, at least in some cases, looked for indicators of a traditional employment relationship, such as "the hiring party's provision of tools, resources, or

19

overhead," *Kirby*, 726 F.3d at 140, or the hired party's "freedom to engage in profitable outside activities without sharing the proceeds with [the hiring party]," *Donaldson Publ'g Co. v. Bregman, Vocco & Conn, Inc.*, 375 F.2d 639, 643 (2d Cir. 1967). "The absence of a fixed salary, however, is never conclusive, nor is the freedom to do other work . . . ." *Picture Music, Inc. v. Bourne, Inc.*, 457 F.2d 1213, 1216 (2d Cir. 1972) (citation omitted).

Ultimately, "[o]ur case law counsels against rigid application of these principles. Whether the instance and expense test is satisfied turns on the parties' creative and financial arrangement as revealed by the record in each case." *Kirby*, 726 F.3d at 140.

If the hiring party is able to satisfy the instance and expense test it "is presumed to be the author of the work." *Playboy Enters., Inc.*, 53 F.3d at 554. "That presumption can be overcome, however, by evidence of a contrary agreement, either written or oral." *Id*.

2. Application of the Instance and Expense Test

The district court ruled that the Iron Man composition was a "work for hire" as a matter of law. The court determined that the Iron Man composition was created at Marvel's "instance" because it was "developed to Marvel's specifications and for Marvel's approval." *Urbont*, 100 F. Supp. 3d at 352. The court

20

1   noted that Urbont had no previous familiarity with the Marvel

2   superheroes and he created the work from source material that

3   was given to him by Stan Lee. *Id.* Further, Marvel determined

4   the subject matter and scope of Urbont's compositions, and

5   Marvel had the right to accept or reject his songs. *Id.* The

6   district court also concluded that the work was created at

7   Marvel's "expense" because Urbont received a fixed sum in

8   exchange for his work. *Id*. That Urbont did not receive a fixed

9   salary, was not barred from undertaking other projects, and

10   claimed to have received royalties were not sufficient in the

11   district court's view to overcome the conclusion that the work

12   was created at Marvel's expense. *Id.*

13      While the factors cited by the district court are clearly

14   probative of whether the work was for hire, there are other

15   factors that the district court did not explicitly consider.

16   Regarding the "instance" requirement, it appears beyond dispute

17   that Urbont created the Iron Man composition at the impetus of

18   Stan Lee and based on the characters of his television show.

19   Urbont testified, however, that he retained all of the creative

20   control over the project, as Lee was not permitted to modify the

21   work but only had the right to accept or reject it. *Cf. Kirby*,

22   726 F.3d at 142 (holding work was for hire due in part to hiring

23   party's "active involvement in the creative process, coupled

24   with its power to reject pages and request that they be

1   redone"); *Picture Music, Inc. v. Bourne, Inc.*, 457 F.2d 1213,

2   1217 (2d Cir. 1972) (holding that work was for hire where hiring

3   party "had the power to accept, reject, or modify [the hired

4   party's] work"). In addition, Urbont claims that he approached

5   Stan Lee, not the other way around, and he "wrote the songs on

6   spec[ulation] hoping [Marvel] would use them." A. 94. Thus,

7   according to Urbont, there was no prior working relationship

8   between Urbont and Marvel, nor was there was any guarantee that

9   Marvel would accept his work. *Cf. Kirby*, 726 F.3d at 141

10   (noting evidence indicated that artist "did not work on 'spec'

11   (speculation)," thus supporting the conclusion that work was for

12   hire). These factors weigh against a finding that the work was

13   created at Marvel's "instance."

14       As for the expense factor, Urbont claims that he

15   independently recorded and produced the Iron Man theme song with

16   his own tools and resources, including a recording studio he

17   rented; he claims he was essentially paid only to cover his

18   costs, not to profit from the project. *Cf. Kirby*, 726 F.3d at

19   140 (suggesting that "the hiring party's provision of tools,

20   resources, or overhead may be controlling"); *Martha Graham*, 380

21   F.3d at 638 (holding that hired choreographer's use of dance

22   center's resources, including rehearsal space and student

23   dancers, "significantly aided [her] in her choreography, thereby

24   arguably satisfying the 'expense' component of the 'instance and

1   expense' test").[8]   These factors support the inference that

2   Urbont "b[ore] the risk with respect to the work's success,"

3   *Kirby*, 726 F.3d at 140, although the fact that the Iron Man

4   composition "built on preexisting titles and themes that Marvel

5   had expended resources to establish," *id*. at 143, would support

6   the opposite conclusion.   Finally, although Urbont was paid a

7   fixed sum of $3000, bolstering the conclusion that the work was

8   created at Marvel's expense, he also claims he received

9   royalties, which would undermine that same conclusion. *See id*.

10  at 140.

11      Considering all of these factors, we conclude that genuine

12  issues of material fact remain as to whether the Iron Man

13  composition was created at Marvel's instance and expense.

14  Urbont's assertion that he "was not hired when [he] wrote the

15  songs" but instead "wrote the songs on spec[ulation] hoping

---

[8]  In *Playboy Enterprises*, we dismissed as irrelevant to the
"expense" requirement factors that may be used to show that an
artist worked as an independent contractor, such as whether the
artist worked his own hours, hired his own assistants, and paid
his own taxes and benefits.  53 F.3d at 555.  Instead, we found
the "expense" requirement to be satisfied "where a hiring party
simply pays an independent contractor a sum certain for his or
her work." *Id*.  We later criticized the *Playboy Enterprises*
decision's exclusive focus on the method of payment, however, as
"a rather inexact method of properly rewarding with ownership
the party that bears the risk with respect to the work's
success." *Kirby*, 726 F.3d at 140.  Ultimately, we cautioned in
that case against "rigid application" of the instance and
expense test in favor of examining "the parties' creative and
financial arrangement as revealed by the record in each case."
*Id*.

[Marvel] would use them," A. 94, distinguishes this case from the arrangement between Marvel and an independently contracted artist which we held in *Kirby* was work for hire. There, we explained that "that Marvel and Kirby had a standing engagement whereby Kirby would produce drawings designed to fit within specific Marvel universes." *Kirby*, 726 F.3d at 142. Thus, "[w]hen Kirby sat down to draw, . . . it was not in the hope that Marvel or some other publisher might one day be interested enough in them to buy, but with the expectation, established through their ongoing, mutually beneficial relationship, that Marvel would pay him." *Id.* at 142–43. Urbont contends, by contrast, that he was "not being paid as a job to write the songs," A. 93, but rather "[a]ll [he] wanted to do was to make sure that [his] costs were covered[,] [and he] would license this material to [Marvel] to use." A. 95. There was no established working relationship or guarantee of payment. As Urbont explained, Marvel "had the right to like my songs or not like my songs. They could have rejected my songs." A. 116. Marvel did not pay Urbont until after it had accepted the Iron Man composition.

Other factors further undermine the conclusion that the work was for hire, including that Marvel, according to the uncontradicted testimony of Urbont, which we must credit in assessing the appellees' summary judgment motion, was not

24

1 permitted to modify the work without Urbont's permission, that

2 Urbont recorded and produced the composition entirely

3 independent of Marvel, and that he claims to have received

4 royalties in addition to a fixed sum of payment. Together,

5 these factors are sufficient to raise genuine issues of fact as

6 to whether the work was for hire.

7         3. Existence of a Contrary Ownership Agreement

8     As explained above, "once it is determined that a work is

9 made for hire, the hiring party is presumed to be the author of

10 the work." *Playboy Enters.*, 53 F.3d at 556. The independent

11 contractor bears the burden by a preponderance of the evidence

12 of overcoming this presumption with evidence of a contrary

13 agreement, either written or oral, that was entered into

14 contemporaneously with the work.[9] *Id.* at 554-55; *see also Kirby*,

15 726 F.3d at 143.

16     We conclude that the district court erred in concluding

17 that Urbont failed as a matter of law to produce evidence

18 sufficient to rebut the presumption that Marvel owned the work.

19 In so holding, the district court focused exclusively on the

---

[9] The district court characterized the presumption that the work was made for hire as "almost irrebutable" and held Urbont's claims to a "clear and convincing" burden of proof. *Urbont*, 100 F. Supp. 3d at 353. It is the law of this Circuit, however, that the plaintiff need only establish the existence of a contrary agreement by a preponderance of the evidence. *Playboy Enters., Inc.*, 53 F.3d at 554-55.

1995 Settlement between the parties, reasoning that "the fact that Marvel entered into a licensing settlement with Urbont does not mean that Marvel has concluded or conceded that Urbont is the Composition's owner," and that the existence of a settlement agreement should not supplant a court's independent determination of copyright ownership. *Urbont*, 100 F. Supp. 3d at 353. Even assuming that the Settlement agreement is not materially probative of the parties' understanding for the reasons explained by the district court,[10] Urbont offered other evidence in support of his position, chiefly his deposition testimony that Marvel shared Urbont's understanding that he would own the rights to the Iron Man composition.[11] For summary judgment purposes, the district court was required to accept Urbont's testimony as credible. *Beatie*, 123 F.3d at 710-11. In

---

[10] The district court determined, moreover, that the Settlement did not suffice to rebut Marvel's ownership based on our decision in *Gary Friedrich Enterprises, LLC v. Marvel Characters, Inc.*, 716 F.3d 302, 316 (2d Cir. 2013), which held that the work for hire analysis should not turn on "after-the-fact" agreements intended to retroactively alter the parties' relationship. *Urbont*, 100 F. Supp. 3d at 354. *Gary Friedrich Enterprises* is not on point, however, as the parties attempted in that case to render a work for hire "*ex post facto.*" 716 F.3d at 316. In this case, by contrast, the 1995 Settlement was offered as evidence to corroborate the existence of an earlier ownership agreement between the parties.

[11] In denying Urbont's motion for reconsideration, the district court acknowledged that it had failed explicitly to consider his testimony that an agreement existed, but it continued to reject his claim to ownership "as unsupported by anything beyond self-serving testimony." *Urbont*, 2015 WL 3439244, at *1.

26

1　addition, the district court did not consider evidence

2　corroborating the existence of the agreement, including, *inter*

3　*alia*, Urbont's copyright registration in 1966, contemporaneously

4　with the alleged ownership agreement, and his subsequent renewal

5　of the registration in 1995; Urbont's testimony that he received

6　royalties for performances of the Iron Man composition; and his

7　licensing of the Iron Man theme song for use in the 2008 Iron

8　Man movie.　Based on this evidence, a reasonable jury could

9　conclude by a preponderance of the evidence that an ownership

10　agreement existed between Urbont and Marvel.　*See Byrnie v. Town*

11　*of Cromwell, Bd. of Educ.*, 243 F.3d 93, 101 (2d Cir. 2001)

12　("[I]n order to defeat summary judgment, the nonmoving party

13　must offer enough evidence to enable a reasonable jury to return

14　a verdict in its favor").

15　　We thus conclude that Urbont has raised genuine issues of

16　material fact with respect to his claim of copyright

17　infringement, and we vacate the district court's grant of

18　summary judgment in favor of the appellees.[12]

19

20

---

[12] Urbont contends, moreover, that he is entitled to summary judgment because the appellees failed to produce any evidence rebutting his evidence of an ownership agreement.　The appellees have, however, produced evidence that Marvel did not share Urbont's understanding of any such agreement, and, therefore, there remain questions of fact to be resolved.

1                    C. State Law Claims

2        Finally, Urbont claims that the district court erred in

3   dismissing his New York law claims for copyright infringement,

4   unfair competition, and misappropriation.  The district court

5   held that the Iron Man recording is not a "sound recording"

6   protected from preemption by the Copyright Act of 1976, but

7   rather an accompaniment to an "audiovisual work" that is subject

8   to preemption under 17 U.S.C. § 102(a)(6).

9        One of the goals of the Copyright Act of 1976 was to create

10  a "national, uniform copyright law by broadly pre-empting state

11  statutory and common-law copyright regulation."  *Cmty. for*

12  *Creative Non-Violence*, 490 U.S. at 740 (citing 17 U.S.C.

13  § 301(a)).  Accordingly, the Copyright Act preempts state law

14  claims asserting rights equivalent to those protected within the

15  general scope of the statute.  17 U.S.C. § 301(a).  The statute

16  provides an exception to its preemptive scope, however, in the

17  case of "sound recordings fixed before February 15, 1972," which

18  remain subject to protection under state statutes or common law.

19  *Id.* § 301(c).

20       The Act defines "sound recordings" as "works that result

21  from the fixation of a series of musical, spoken, or other

22  sounds, but not including the sounds accompanying a motion

23  picture or other audiovisual work, regardless of the nature of

24  the material objects, such as disks, tapes or other

28

1   phonorecords, in which they are embodied." 17 U.S.C. § 101.

2   "Audiovisual works," by contrast, are "works that consist of a

3   series of related images which are intrinsically intended to be

4   shown by the use of machines, or devices such as projectors,

5   viewers, or electronic equipment, together with accompanying

6   sounds . . . ." *Id*. Urbont argues that he holds rights in a

7   pre-1972 sound recording because a "separate sound recording . .

8   . was made and exists wholly apart from the creation of the

9   audiovisual works in question" as embodied in the "form of a

10   master tape" which he still possesses. Appellant's Br. 46. But

11   while Urbont may possess a "master tape," it is undisputed that

12   prior to the release of the Supreme Clientele album in 2000, the

13   sound recording of the Iron Man theme song was never released as

14   an independent audio recording without a visual component. The

15   legislative history of the 1976 Act states that "[t]he purely

16   aural performance of a motion picture sound track, or of the

17   sound portions of an audiovisual work, would constitute a

18   performance of the 'motion picture or other audiovisual work';

19   but, where some of the sounds have been reproduced separately on

20   phonorecords, a performance from the phonorecord would not

21   constitute performance of the motion picture or audiovisual

22   work." H.R. Rep. No. 94-1476, at 64 (1976). It is clear in

23   this case that the allegedly infringing work could only have

29

1  been copied from the audiovisual work, and therefore constitutes

2  infringement of the audiovisual work.

3      Implicit in Urbont's argument is the idea that because

4  copyright inheres at the moment of creation, he has a separate

5  copyright in the sound recording of the Iron Man theme song,

6  because it was recorded and fixed in a master tape prior to

7  being incorporated into the audiovisual work.  While the plain

8  language of the statute does not resolve this issue, there are

9  two reasons why we find this argument unpersuasive.  First, at

10  the moment of creation, when the song was recorded and embodied

11  in a master tape, it was intended to be a part of a larger

12  audiovisual work, as it was recorded in Munich only after Marvel

13  accepted the work and agreed that it would be a part of the

14  audiovisual work.  A. 119.  Second, while it is true that the

15  song was recorded before it was combined with the visual portion

16  of the work, this is true of nearly all sound tracks.  If

17  Urbont's theory was correct, then no audio portion of an

18  audiovisual work would be preempted by the 1972 Act, save for

19  those few that are recorded simultaneously with the visual

20  component.  This narrow interpretation does not mesh with

21  Congress's intent to broadly preempt state law protections by

22  creating a "national, uniform copyright law." *Cmty. for*

23  *Creative Non-Violence*, 490 U.S. at 740.

30

1    Urbont's contention that he composed and recorded the Iron

2  Man theme song "without ever viewing the television program, and

3  without interaction from anyone associated with the television

4  show," Appellant's Br. 46, is belied by his own testimony that

5  the work was created at the impetus of, and based on source

6  material from, Stan Lee, someone clearly associated with the

7  television program.  Urbont further asserts that Marvel agreed

8  that he would own the Iron Man sound recording separate and

9  apart from the television program, but the existence of any such

10 agreement is irrelevant to determining whether the recording is

11 a "sound recording" or part of an "audiovisual work" as defined

12 in the statute.

13    Finally, Urbont argues that if the Iron Man sound recording

14 is considered to be part of the audiovisual work, then Marvel

15 would have no reason to obtain a license from Urbont to use the

16 theme song.  Legislative history to the 1972 Sound Recording

17 Act, however, which created a copyright in sound recordings,

18 indicates that in excluding tracks accompanying audiovisual

19 works from the definition of "sound recording," Congress "d[id]

20 not intend to limit or otherwise alter the rights that exist

21 currently in such works," such as Urbont's rights to the Iron

22 Man composition.  H.R. Rep. No. 92-487, at 6 (1971).  If, for

23 example, "there is an unauthorized reproduction of the sound

24 portion of a copyrighted television program fixed on video tape,

31

1   a suit for copyright infringement could be sustained under [the

2   1909 Act] rather than under the provisions of [the 1972 Sound

3   Recording Act], and this would be true even if the television

4   producer had licensed the release of a commercial phonograph

5   record incorporating the same sounds." *Id.*

6        We conclude, therefore, that the Iron Man recording is not

7   a separate sound recording but rather part of an audiovisual

8   work for purposes of preemption under the Copyright Act, and the

9   district court properly dismissed Urbont's state law claims on

10   this basis.

11                     IV. Conclusion

12        For the foregoing reasons, we VACATE the district court's

13   grant of summary judgment in favor of appellees on Urbont's

14   federal Copyright Act claim. We AFFIRM the court's dismissal of

15   his state law claims for copyright infringement, unfair

16   competition, and misappropriation. We REMAND for further

17   proceedings consistent with this opinion. Each party shall bear

18   its own costs on appeal.

A True Copy
Catherine O'Hagan Wolfe, Clerk
United States Court of Appeals, Second Circuit